UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| VENIDA WHITTAKER | ) | |
| | ) | |
| V. | ) | NO. 2:07-CV-177 |
| | ) | |
| DORIS WHITTAKER and RICHARD EDWARD WHITTAKER ESTATE | ) ) | |

## MEMORANDUM AND ORDER

This is a suit on a $485,000.00 demand note executed on June 24, 2002, by Richard Whittaker and his wife, Doris, payable to Richard's parents, Earl and Venida Whittaker. The defendants contend that the suit should be dismissed because the note was not supported by any consideration. As between themselves, in the event the plaintiff is allowed to recover on the note, the defendant Doris Whittaker asks that she be indemnified by the Estate of Richard Whittaker; the Estate asks that any judgment on the note be rendered against both defendants, jointly and severally. For the sake of clarity, the parties hereafter will be identified only by their first names.

In 1981, Earl and Venida transferred to their son, Richard, a tract of land in Rowan County, Kentucky, upon which was situated a building used originally as a tobacco warehouse (the "warehouse property"). Ultimately, Richard and Doris operated a furniture store in the building.

In approximately 1992, Richard commenced living with Doris.

In January 1993, Richard conveyed to his parents, Earl and Venida, a life estate in the

warehouse property. More likely than not, he did so at the request of his parents, which in turn was prompted by his relationship with Doris. At all relevant times, Richard and Doris were residents of Kentucky, and Earl and Venida resided in Tennessee.

In December 1995, Richard married Doris. Although Doris had no interest in the warehouse property, she assisted Richard in operating the furniture store business.

Notwithstanding that Richard and Doris used the warehouse property for their business, they paid no rent to the life tenants, Earl and Venida, for that use. Also, a company had leased a portion of the warehouse property for erection of a billboard sign, and Richard and Doris retained all rent from that lease with the acquiescence of Earl and Venida. Although Earl and Venida did not receive any portion of the rents and profits from the warehouse property, neither did they pay the taxes, insurance premiums, and maintenance expenses.

In 2000, the warehouse property was damaged by a flood. Richard and Doris obtained a loan from the Small Business Administration ("SBA") in the amount of $84,200.00 to repair that flood damage, and a mortgage was executed by the owner of the fee title, Richard, and the two life tenants, Earl and Venida, to secure repayment of that SBA loan. Doris also executed that mortgage, notwithstanding that her only interest in the warehouse property was whatever interest Kentucky law granted her by virtue of being the wife of the fee owner.

In 2001, the building and its contents were damaged by an even more devastating flood, prompting Richard and Doris to again contact the SBA regarding a second loan on the warehouse property. On May 13, 2002, Richard and Doris executed a promissory note to the

2

SBA in the amount of $292,500.00. Venida asserted in her motion for summary judgment that Richard and Doris were told by SBA that it would disburse no more than $10,000.00 of loan proceeds unless Earl and Venida executed a continuing guaranty.[1] At trial, it was learned that Venida's assertion was only partly correct: 13 C.F.R. § 123.11 provides:

> Generally, SBA will not require that you pledge collateral to secure . . . a physical disaster business loan of $10,000.00 or less . . . . For loans larger . . ., you will be required to provide available collateral such as a lien on the damage or replacement property . . . .

This loan was far in excess of $10,000.00, and SBA required the borrowers to provide collateral. That collateral was to be a mortgage on the damaged warehouse property. Richard signed that mortgage instrument since he was the sole owner of the fee title. Presumably Doris signed the mortgage to encumber whatever marital interest she might have in the property. Earl and Venida obviously were required to sign the mortgage instrument because they held a life estate in the property. The continuing guaranty itself was not "collateral" for the loan; the only reasonable inference to draw from the evidence is that Earl and Venida were required to sign a continuing guaranty to memorialize the consideration for their mortgage of their respective life estates. Stated another way, absent their execution of the continuing guaranty, there was nothing to show that they received anything from SBA that would constitute a consideration to support the mortgaging of their life estates. This conclusion is further buttressed by the fact that the continuing guaranty itself recited that the

---

[1] or, "guarantee."

3

liability of Earl and Venida was limited to the amount that SBA might obtain from the pledged collateral, i.e., the warehouse property. Thus, in reality, the guaranty did not extend Earl and Venida's potential liability to the SBA beyond the loss of their life estates in the event Richard and Doris defaulted in their repayment obligations to SBA and SBA foreclosed on its mortgage.

The guarantee and the mortgage were received by the SBA on June 10, 2002.[2]

On June 24, 2002, Earl and Venida traveled from their home in Tennessee to the home of Richard and Doris in Kentucky. Earl and Venida demanded that they be given a lien on all property owned by Richard and Doris in light of the obligations they undertook to SBA on behalf of Richard and Doris in connection with the $292,500.00 loan. The equitable value of all of Richard and Doris's properties far exceeded Earl and Venida's potential liability on the SBA loan. After Doris refused to give Earl and Venida a lien on her home and angry words exchanged, Earl and Venida left to return to Tennessee, threatening to rescind their guaranty. However, before they left Kentucky, Richard contacted them by telephone, asking them to remain in Kentucky. Richard later called Doris, instructing her to meet him and his parents at the office of a Kentucky attorney. At the lawyer's office, Doris was presented with a $485,000.00 note, prepared at Richard's instructions, which reads as follows:

> For value received, we **RICHARD E. WHITTAKER and DORIS WHITTAKER** (the "maker"), husband and wife, to the order of **EARL E. WHITTAKER and VENIDA J. WHITTAKER**, husband and wife (the "holder"), at 259 Lakeridge Drive, Jonesborough, TN 37659, the principal sum and amount of **FOUR**

---

[2]The mortgage was recorded in the Rowan County Clerk's Office on June 7, 2002.

4

> **HUNDRED EIGHTY-FIVE THOUSAND DOLLARS ($485,000.00)**, together with interest at the rate of \_\_\_\_\_ Percent(\_\_\_%) per annum, being due and payable on demand of the holder.

Doris and Richard signed the note. Additionally, Richard and Doris executed a mortgage on the warehouse property, as well as a deed of trust on realty in Johnson City, Tennessee, owned by Richard and Doris, to secure the note. Each of these documents had been pre-prepared, the latter by a Tennessee attorney, and were ready to be signed.

At the time the $485,000.00 note was executed, no money or property passed from Earl and Venida to Richard and Doris, although Venida argues that she and Earl agreed to forebear their right to revoke the continuing guaranty, which serves as consideration for the note.

On June 26, 2002, the SBA issued a check in the amount of $103,400.00 to Richard and Doris. Later, other checks in varying amounts were issued by the SBA to Richard and Doris.

In July 2004, Earl died. Shortly thereafter, Venida executed a release of the deed of trust on the Tennessee property so that it could be sold by Richard and Doris.

On February 10, 2005, Richard and Doris divorced. With respect to the Rowan County, Kentucky warehouse property, the divorce agreement stated that "[t]he husband shall receive the Whittaker's Warehouse and the debt of approximately $285,000.00." The agreement also stated that "[t]he parties are splitting the value of the inventory of the furniture business which is valued at $20,000.00."

5

Richard died in May 2006.

Some time prior to Richard's death, he purchased other land and constructed thereon what was referred to as a "strip mall." Richard requested SBA to accept the strip mall as security for the two SBA loans in place of the warehouse property. In other words, he requested that SBA substitute the strip mall as collateral in place of the warehouse property for the 2002 loan. The SBA agreed to do so, but the transfer or substitution was not consummated until after Richard's death. More likely than not, Richard requested this substitution of collateral because he was then negotiating with Wal-Mart for the sale of the warehouse property. When the strip mall was substituted for the warehouse property as collateral for the SBA loan, rather obviously Venida's life estate in the warehouse property was no longer encumbered; it was "free and clear" with respect to the SBA loan. For the same reason, the continuing guaranty executed by Venida and Earl was no longer operable since by its own terms it limited Earl and Venida's liability to the loss of their life estates in the warehouse property.[3]

In December 2006, the warehouse property was purchased by Wal-Mart for $950,000.00. Venida released her mortgage on the warehouse property so that its sale to Wal-Mart could proceed. After payment of various encumbrances and a real estate commission, the net sales proceeds of $821,218.00 were paid to the estate of Richard Whittaker. After negotiations, Venida and the estate agreed to value her life estate at

---

[3]Lastly, it bears noting that the SBA loan was paid in full when the strip mall was sold at public auction.

$252,356.56, and she was paid that amount by Richard's estate.

On August 1, 2007, Venida filed this suit on the $485,00.00 note against Doris and the estate of Richard.

The first issue which this court must decide is whose substantive law to apply, Kentucky's or Tennessee's. "In deciding what substantive law applies, [the court] must first look to the forum state's choice of law statute." *Mackey v. Judy's Foods, Inc*., 867 F.2d 325, 328 (6th Cir. 1989). Since this court sits in Tennessee, it is Tennessee's rules regarding choice of law to which this court must look. The note was executed in Kentucky and by Kentucky residents. However, the note specifically provided that it was to be paid to the order of the obligees "at 259 Lakeridge Drive, Jonesborough, Tennessee." Under Tennessee law, the place of payment determines the law to be applied regarding a promissory note. *Edgington v. Edgington*, 162 S.W.2d 1082, 1085-86 (Tenn. 1942). Therefore, since payment was to be in Tennessee, under Tennessee's choice of law rule, Tennessee law applies.

In Tennessee, the note itself constitutes *prima facie* evidence that it was supported by a consideration**.** Tenn. Code Ann. § 47-50-103. Inadequacy of consideration in and of itself, unaccompanied by circumstances raising a presumption of fraud, is not a defense to enforcement of a promissory note. *See, e.g., Woodard v. Bruce*, 339 S.W.2d 143 (Tenn. App. 1960).

Nothing of value, in the sense of money or property, passed from Earl and Venida to Richard and Doris in return for the execution of the $485,000.00 note. There are only three possibilities as far as the consideration for this note was concerned: (1) Earl and Venida's

7

$252,356.56, and she was paid that amount by Richard's estate.

On August 1, 2007, Venida filed this suit on the $485,00.00 note against Doris and the estate of Richard.

The first issue which this court must decide is whose substantive law to apply, Kentucky's or Tennessee's. "In deciding what substantive law applies, [the court] must first look to the forum state's choice of law statute." *Mackey v. Judy's Foods, Inc*., 867 F.2d 325, 328 (6th Cir. 1989). Since this court sits in Tennessee, it is Tennessee's rules regarding choice of law to which this court must look. The note was executed in Kentucky and by Kentucky residents. However, the note specifically provided that it was to be paid to the order of the obligees "at 259 Lakeridge Drive, Jonesborough, Tennessee." Under Tennessee law, the place of payment determines the law to be applied regarding a promissory note. *Edgington v. Edgington*, 162 S.W.2d 1082, 1085-86 (Tenn. 1942). Therefore, since payment was to be in Tennessee, under Tennessee's choice of law rule, Tennessee law applies.

In Tennessee, the note itself constitutes *prima facie* evidence that it was supported by a consideration**.** Tenn. Code Ann. § 47-50-103. Inadequacy of consideration in and of itself, unaccompanied by circumstances raising a presumption of fraud, is not a defense to enforcement of a promissory note. *See, e.g., Woodard v. Bruce*, 339 S.W.2d 143 (Tenn. App. 1960).

Nothing of value, in the sense of money or property, passed from Earl and Venida to Richard and Doris in return for the execution of the $485,000.00 note. There are only three possibilities as far as the consideration for this note was concerned: (1) Earl and Venida's

7

forebearance of their right to revoke their continuing guaranty to SBA; (2) to belatedly compensate Earl and Venida for the rents and profits they did not receive; or (3) the love and affection they had for their son Richard and their desire to enable him to obtain an SBA disaster loan.

Unfortunately, the court is forced to decide this case based upon inferences drawn from what facts exist. The two individuals who really knew what was intended by the execution of this note are deceased, and neither of their spouses is armed with knowledge of all the critical facts.

### *(1) EARL AND VENIDA'S FORBEARANCE OF THEIR RIGHT TO REVOKE THEIR CONTINUING GUARANTY*

From a practical standpoint, Earl and Venida's forebearance of their right to revoke their guaranty (and of course, the mortgage of their life estates) is precisely the same as their initial agreement to execute that guaranty and mortgage. The difference is one of timing only, and is important only because a past action or performance cannot serve as consideration for a later promise. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595 (Tenn. 2004). A forbearance of a right of recision could constitute a *contemporaneous* action that would serve as a valid consideration. However, the extreme difference between the value of the pledged life estates, which we now know to be no more than $252,000.00, and the value of the demand note, strongly suggest that the parties did not intend that the note was to compensate Earl and Venida for the pledging of their life estates. Additionally, lest the point be overlooked, it must be recalled that Earl and Venida's liability was a contingent one

only, and the loss of their life estates would not occur unless Richard and Doris defaulted in their repayment obligations to SBA.

### *(2) COMPENSATION TO EARL AND VENIDA FOR THE RENTS AND PROFITS THEY DID NOT RECEIVE*

A life tenant is entitled to receive the income from the property in which they hold a life estate, *Pritchett v. Nashville Trust Co.*, 36 S.W. 1064 (Tenn. 1896), and Earl and Venida received no such income. On the other hand, a life tenant must preserve the property, which includes an obligation to pay expenses of upkeep, insurance premiums, and payment of taxes, *Old Nat. Bank v. Swearingen*, 72 S.W.2d 545 (Tenn. 1934). Although Earl and Venida were entitled to income from the property, they also were obligated to pay the taxes and ordinary repair costs, and they did neither. There was a tacit agreement between Richard and his parents that he would enjoy the income from the property, and at the same time maintain it (which he did), protect it by payment of insurance premiums (which he did), and pay the taxes on it (which he did).

The warehouse property was given to Richard in 1981 as a gift. When he commenced his relationship with Doris, his parents doubtlessly considered the possibility that he might lose the property that they gave him, prompting Richard to convey to them a life estate. Neither Richard nor his parents insisted upon the rights and obligations technically attendant to a life estate; the life estate was intended to keep the warehouse property in the family, at least so long and Earl and Venida remained alive. In any event, the $485,000.00 note certainly was not intended to compensate Earl and Venida for the income they were not

9

receiving from the warehouse property.

### *(3) THE LOVE AND AFFECTION EARL AND VENIDA HAD FOR THEIR SON RICHARD*

Venida herself believes that she and Earl executed the continuing guaranty, and pledged their life estates, to enable Richard and Doris to obtain the SBA disaster loan.[4] It doubtlessly happens thousands of times a year across this country - parents co-sign loans and pledge their own properties to aid their children and grandchildren in emergency situations.

Actually, this note was intended to serve as security in the event Richard and Doris defaulted in their repayment obligations to SBA, in which event Earl and Venida would have lost their life estates in the property which they had given to their son in 1981. None of the three primary actors - Earl, Venida, and Richard - considered this $485,000.00 note to be a true obligation. This conclusion is borne out by various subsequent events:

First, in the property settlement agreement filed in their 2005 divorce action, Richard and Doris agreed that Richard should receive the warehouse property "and the debt of approximately $285,000.00," which clearly referred to the balance owing SBA; no mention at all was made of a $485,000.00 note owing Richard's parents.

Second, before Richard's death, Venida released the deed of trust on the Johnson City, Tennessee property, and after his death she released her mortgage on the warehouse property so that it could be sold to Wal-Mart. From the proceeds of that sale, she ultimately was paid $252,000.00 for her life estate. The $485,000.00 note was intended to secure Earl and

---

[4]Ex. 14, pp. 46-48.

Venida against the potential loss of their life estates in the event Richard and Doris failed to repay the SBA loan and SBA foreclosed upon its mortgage. When SBA substituted the strip mall property as collateral for its loan, there was no longer any basis for the continuation of the $485,000.00 note; its *raison d'etre* evaporated. Venida's release of the deed of trust and the mortgage overwhelmingly suggests that she did not expect repayment of the $485,000.00 note; at that time she knew her life estate was unencumbered and secure, and the $485,000.00 note was unnecessary.

Third, the note was a demand note, suggesting that Earl and Venida would call for payment only if some future contingency occurred, *viz.*, the imminent loss of their life estates.

Fourth, the note contained no interest rate, again suggesting that it was intended to serve as security for Richard and Doris's repayment of the SBA loan.

And then there is the most compelling reason of all, which is well-nigh conclusive: On June 24, 2002, the $485,000.00 note and two accompanying mortgage instruments already had been prepared when Doris arrived at the Kentucky lawyer's office at Richard's behest. The Kentucky mortgage instrument on the warehouse property contained this language:

> It is further understood that this mortgage is inferior to the mortgages to The Citizens Bank and to The Small Business Administration. This mortgage shall be deemed satisfied and released when the total principal balances owed on the superior

mortgages is reduced [to] the sum of $250,000.00.[5]

The deed of trust on the Johnson City, Tennessee property contained even more explicit language:

> BUT THIS CONVEYANCE IS MADE IN TRUST, for the following uses and purposes, and none other. That is to say, the Parties of the First Part are justly indebted to Earl E. Whittaker and wife, Venida J. Whittaker, in the full amount of One Hundred Fifty Thousand (150,000.00) and 00/100 Dollars, evidenced by promissory note of even date herewith, bearing no interest per annum, and due and payable as follows:
>
>> To secure One Hundred Fifty Thousand ($150,000.00) and 00/100 Dollars, of a note securing U.S. Small Business Administration guaranteed by Earl E. Whittaker and wife, Venida J. Whittaker, should the debtors default on the loan to the Small Business Administration, this note becomes immediately due and payable.
>>
>> When the note to the U.S. Small Business Administration is reduced to a balance of Two Hundred Fifty Thousand ($250,000.00) and 00/100 this note shall be satisfied and this Trust Deed released. *See Rowan Cy, Kentucky A179 & PG 77 to PG 81*[6] [7]

To be sure, the amounts set forth in each document are puzzling, and the explanation for those amounts is buried with Richard and Earl. But one thing is certain, as shown in the

---

[5]Ex. 11, p. 2.

[6]Ex. 1, p. 2.

[7]The italicized sentence was a hand-written addition to the document, and was initialized by Richard, Doris, Earl and Venida. The reference to "A179 & PG 77 to 81" was to the book and page where the SBA mortgage was recorded in the appropriate official's office in Rowan County, Kentucky.

12

Tennessee deed of trust: The $485,000.00 note was intended to serve as security for Earl and Venida in the event Richard and Doris defaulted in their repayment obligations to the SBA. The parties never intended that the $485,000.00 note would survive repayment of the SBA loan and the release of the SBA mortgage on the warehouse property.

For the foregoing reasons, the court concludes that Venida should take nothing and that her complaint should be **DISMISSED**.

In light of the dismissal of the complaint, the respective cross actions of Doris and the Estate are **MOOT** and therefore they, too, should be **DISMISSED**. The Clerk should prepare an appropriate judgment.

SO ORDERED:

                 s/ Dennis H. Inman
                 United States Magistrate Judge